COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                       NO.  2-09-041-CV

 

 

IN THE INTEREST OF K.W.,
A CHILD                                                      

 

 

                                              ------------

 

           FROM
THE 323RD DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------

I. Introduction

Appellant
S.H., the alleged biological father of K.W., appeals the trial court=s order
terminating the parent-child relationship between himself and K.W. In four
issues, Appellant challenges the legal and factual sufficiency of the evidence
regarding the court=s findings of fact.  We will affirm.








II. Factual and Procedural History

K.W. was
born to J.W. (AMother@) on
March 5, 2008.  Mother and K.W. tested
positive for methamphetamine on the day of birth.  On March 10, 2008, the Texas Department of
Family and Protective Services (Athe
Department@) filed a Petition for
Protection of a Child, for Conservatorship, and for Termination in a Suit
Affecting the Parent/Child Relationship.[2]  The trial court held a show cause hearing on
March 14, 2008, and a two-day final hearing on the Department=s
petition beginning January 26, 2009.[3]

The
trial court terminated Appellant=s and
Mother=s
parental rights on February 6, 2009. 
Because Mother has not appealed, we summarize only those facts pertinent
to the termination of Appellant=s
parental rights.

A.
Appellant=s Criminal History








Appellant
served approximately thirty-six months in jail over the last decade on eight
convictions.  At the age of 22, Appellant
received two years= deferred adjudication for
possession of methamphetamine, less than one gram.  Appellant then served ninety days in jail
after the court revoked his probation on January 18, 2000, for assaulting his
daughter=s
mother.[4]

On
December 19, 2001, Appellant pleaded guilty to two counts of possession of
methamphetamine and received two concurrent two-year jail sentences.  In November 2003, Appellant received a
sentence of one year imprisonment for forgery. 
In July 2007, a court sentenced Appellant to 180 days=
imprisonment for possession of methamphetamine.[5]  On September 25, 2008, a court sentenced
Appellant to four years= imprisonment for unlawfully
possessing a firearm,[6]
and placed him on deferred adjudication probation for ten years with a $1,000
fine for the separate offense of intent to deliver between one and four grams
of methamphetamine.

B.
Appellant=s Relationship with Mother and
His Claim of Paternity








Appellant
and Mother were friends who used methamphetamine together. Appellant testified
he learned he might be K.W.=s father
when Mother visited him in jail and revealed she was two months=
pregnant.  Two days after K.W.=s birth,
Mother told a Child Protective Services (CPS) investigator that Appellant may
be the father and provided no indication of other potential fathers.

Appellant
does not dispute that he did not file an admission of paternity or a
counterclaim for paternity in this case. 
However, Appellant did file a timely answer generally denying the
Department=s claims.  At trial, Appellant acknowledged he is K.W.=s
biological father and testified, AOnce I
had seen the pictures of [K.W.], I thought that we wereCthat it
was very little chance that he was not mine, but I don=t have a
problem with taking a DNA test.@

C. The
Department=s Initial Actions








The
Department received notice on March 6, 2008, that Mother tested positive for
methamphetamine at K.W.=s birth.  The next day, CPS Investigator Teresa Shipley
visited Mother in the hospital.  During
Shipley=s visit,
Mother was uncooperative, claiming that her attorney advised her Anot to
answer any more questions nor sign any more papers@ and
denying drug use or having any history with CPS.[7]  Shipley did learn that Mother=s mother
had recently moved to Louisiana and that Mother was living with some of
Appellant=s family, but Mother did not
provide a local address.  In response to
Shipley=s
inquiries, Mother provided Appellant=s name
as K.W.=s
potential father, stated Appellant was in the Tarrant County jail, and provided
the names of Appellant=s mother and sister.  Mother did not provide any contact
information for these individuals, nor did she identify other family members as
potential placements for K.W. 

Shipley
testified she was concerned for K.W.=s safety
if K.W. was placed with Mother upon being released from the hospital.  She therefore obtained a court order for K.W.=s
emergency removal from Mother.  The state
took custody of K.W. on March 7, 2008, and placed K.W. with a foster home.

Regarding
the Department=s communication with Appellant
during this time period, Shipley testified she was uncertain whether she sent
him a letter and could not recall if she had gone to the jail to speak with
him.  Shipley agreed, however, that if
potential placement options are identified by the father, they are considered
by CPS.  Shipley also admitted she did
not meet with Appellant prior to her signing the affidavit requesting emergency
relief.  Shipley explained that Mother
never definitively said that Appellant was the father, nor did Mother identify
any of Appellant=s family members as potential
placements for K.W.








D. The
Effort to Place K.W. with Family

Shortly
after the March 14, 2008 show cause hearing, CPS conducted a home study on Judy
Golden, a friend of Appellant=s
mother.  The home study tentatively
recommended placing K.W. with Golden, but Golden declined to submit to a drug
test.  Mother identified no other
potential placements for K.W.

Appellant=s sister
accompanied Mother on her first visit with K.W. under Mother=s
service plan.  During the visit, CPS
caseworker Whitney Lagadinos spoke with Appellant=s sister
and obtained her contact information, but Lagadinos determined Appellant=s sister
was not a possible placement for K.W. because she was living with Asomebody
who had a questionable criminal history.@

At
Appellant=s request,[8]
Lagadinos contacted Appellant=s
grandmother, who declined a home study because of her age and health problems.

E.
Appellant=s Service Plan and Efforts to
Keep K.W. 








After
being released from jail on bond in late April 2008, Appellant visited with
K.W. on several occasions.  He met
Lagadinos on May 6, 2008, while attending a parent-child visit with Mother.  During this meeting, Lagadinos reviewed
Appellant=s service plan with him.  It included a drug and alcohol assessment, a
psychological evaluation, parenting classes, drug screenings, and stable
housing and employment evaluations. 
Lagadinos testified Appellant indicated he understood the service plan=s
requirements and was willing to complete themCalthough
he acknowledged that his ability to do so would require completion before he
was sentenced and returned to jail. 
Appellant failed to complete any of the services in his plan before he
returned to jail in September 2008.

Appellant
supported placement of K.W. with Mother. 
In early January 2009, however, he learned from his family that Mother
could not be located and had stopped visiting K.W.[9]  Appellant then asked his sister to Atake
steps to [do] whatever it took to get [his] baby.@  Appellant=s sister
knew her former live-in boyfriend=s
criminal historyCa child endangerment charge
involving driving and drugsCpreviously
disqualified her from being a candidate for placement.[10]  Approximately one week before the January 26,
2009 termination hearing, Appellant=s sister
rented her own apartment and notified CPS that she would like to be
reconsidered for placement.








F. The
Trial Court=s Decision

Following
a bench trial, the trial court found (1) that Appellant failed to assert
paternity in accordance with family code section 161.002; (2) that Appellant
endangered K.W. by (a) knowingly placing or knowingly allowing K.W. to remain
in conditions that endangered his well-being, and (b) engaging in conduct or
knowingly placing K.W. with persons who engaged in conduct that endangered his
well-being; (3) that Appellant constructively abandoned K.W.; and (4) that
termination of the parent-child relationship was in K.W.=s best
interest.  Tex. Fam. Code Ann. ' 161.002(b)(1)
(Vernon 2008).

III. Discussion

A.
Appellant Admitted Paternity

In his
first issue, Appellant argues that the trial court erred by finding that he
failed to admit paternity under chapter 160 of the Texas Family Code. We agree.[11]








Subsection
161.002(b)(1) of the family code allows the Department to summarily terminate
the rights of an alleged biological father who does not assert his
paternity.  Tex. Fam. Code Ann. ' 161.002(b)(1);
Phillips v. Tex. Dep=t of
Protective & Regulatory Servs., 25 S.W.3d 348, 357 (Tex. App.CAustin
2000, no pet.).  Section 161.002(b)
provides that A[t]he rights of the alleged
father may be terminated if [ ] . . . after being served with citation, he does
not respond by timely filing an admission of paternity or a counterclaim for
paternity under chapter 160.@  Tex. Fam. Code Ann. ' 161.002(b).  However, if the alleged father files an
admission of paternity or otherwise claims paternity, the alleged father
prevents summary termination of his rights, and the Department must instead
meet the high burden of proof found in section 161.001.  Tex. Fam. Code Ann. '
161.002(a); Phillips, 25 S.W.3d at 357.

The
trial court=s judgment recites that
Appellant is the alleged biological father of K.W.  The judgment also declares Appellant=s
alleged parental rights are terminated under section 161.002(b)(1) because,
after being served with citation, he Adid not
respond [to this termination suit] by filing an admission of paternity or by
filing a counterclaim for paternity or for voluntary paternity to be
adjudicated under chapter 160 of the Texas Family Code . . . .@ 








This
court has held that there are no formalities that must be observed for an
admission of paternity to be effective.  See,
e.g., In re V.S.R.K., No. 02-08-047-CV, 2009 WL 736751, at *4 (Tex. App.CFort
Worth Mar. 19, 2009, no pet.); In re K.W., 138 S.W.3d 420, 430 (Tex.
App.CFort
Worth 2004, pet. denied) (holding letters written by the alleged father to the
trial court stating he was the child=s father
were sufficient, alone, to be an admission of paternity); see also Toliver
v. Tex. Dep't of Family & Protective Servs., 217 S.W.3d 85, 105 (Tex.
App.CHouston
[1st Dist.] 2006, no pet.) (holding that alleged father=s
appearance at termination hearing and admission that he was the child=s father
were sufficient to prevent the summary termination of his parental rights);
Estes v. Dallas County Child Welfare Unit of Tex. Dep't of Human Servs.,
773 S.W.2d 800, 802 (Tex. App.CDallas
1989, writ denied) (citing Holick v. Smith, 685 S.W.2d 18, 20 (Tex.
1985) (holding that a pro se answer filed by alleged father, in which he claims
to be an indigent parent and requests the appointment of an attorney,
constitutes an admission of paternity)).

In this
case, Appellant did not file a counterclaim for paternity or for voluntary
paternity under chapter 160 of the family code. 
However, he filed a timely answer, claimed to be an indigent parent,
requested the appointment of counsel, and made numerous admissions of paternity
during trial: 

Attorney:    At
any point in time, have you questioned whether or not [K.W.] was your child?

 

Appellant:   No.

. . . .

Attorney:    And are you acknowledging that you=re [K.W.=s]
father?

Appellant:   Yes, I am.








Because
we are required to strictly construe involuntary termination statutes in favor
of the parent, we conclude that Appellant admitted his paternity of K.W. for
purposes of section 161.002(b)(1) by timely filing a general denial and
admitting paternity during his trial testimony.  See In re E.M.N., 221 S.W.3d 815, 820
(Tex. App.CFort Worth 2007, no pet.); see
also Holick, 685 S.W.2d at 18, 20B21.
Therefore, the Department was not entitled to summary termination of
Appellant's parental rights under family code section 161.002(b)(1), and we
will review the trial court's findings supporting termination under section
161.001.

B.
Grounds for Termination

1.
Standard of Review

A parent=s rights
to Athe
companionship, care, custody, and management@ of his
or her children are constitutional interests Afar more
precious than any property right.@  Santosky v. Kramer, 455 U.S. 745, 758B59, 102
S. Ct. 1388, 1397 (1982); In re M.S., 115 S.W.3d 534, 547 (Tex.
2003).  AWhile
parental rights are of constitutional magnitude, they are not absolute.  Just as it is imperative for courts to
recognize the constitutional underpinnings of the parent-child relationship, it
is also essential that emotional and physical interests of the child not be
sacrificed merely to preserve that right.@  In re C.H., 89 S.W.3d 17, 26 (Tex.
2002).








In a
termination case, the State seeks not just to limit parental rights but to
erase them permanentlyCto divest the parent and child
of all Alegal
rights, privileges, duties, and powers normally existing between them, except
for the child=s right to inherit.@ Tex.
Fam. Code Ann. ' 161.206(b) (Vernon Supp. 2009);
Holick, 685 S.W.2d at 20 (Tex. 1985). 
Accordingly, we strictly scrutinize termination proceedings and strictly
construe involuntary termination statutes in favor of the parent.  Id. at 20B21;
In re M.C.T., 250 S.W.3d 161, 167 (Tex. App.CFort
Worth 2008, no pet.).

In
proceedings to terminate the parent‑child relationship brought under
section 161.001 of the family code, the petitioner must establish at least one
ground listed under subsection (1) of the statute and prove that termination is
in the best interest of the child.  Tex.
Fam. Code Ann. ' 161.001 (Vernon Supp. 2009); In
re J.L., 163 S.W.3d 79, 84 (Tex. 2005). 
Both elements must be established; termination may not be based solely
on the best interest of the child as determined by the trier of fact.  Tex. Dep=t of
Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987).








Termination
decisions must be supported by clear and convincing evidence.  Tex. Fam. Code Ann. ''
161.001, 161.206(a).  Evidence is clear
and convincing if it Awill produce in the mind of the
trier of fact a firm belief or conviction as to the truth of the allegations
sought to be established.@  Id. ' 101.007
(Vernon 2006).  Due process demands this
heightened standard because termination results in permanent, irrevocable
changes for the parent and child.  In
re J.F.C., 96 S.W.3d 256, 263 (Tex. 2002); see In re J.A.J.,
243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification
of parental rights).

In
reviewing the evidence for legal sufficiency in parental termination cases, we
must determine whether the evidence is such that a factfinder could reasonably
form a firm belief or conviction that the grounds for termination were
proven.  In re J.P.B., 180 S.W.3d
570, 573 (Tex. 2005).  We must review all
the evidence in the light most favorable to the finding and judgment.  Id. 
This means that we must assume that the factfinder resolved any disputed
facts in favor of its finding if a reasonable factfinder could have done
so.  Id.  We must also disregard all evidence that a
reasonable factfinder could have disbelieved. 
Id.  We must consider,
however, undisputed evidence even if it is contrary to the finding.  Id. 
That is, we must consider evidence favorable to termination if a
reasonable factfinder could, and disregard contrary evidence unless a
reasonable factfinder could not.  Id.








We must
therefore consider all of the evidence, not just that which favors the verdict.  Id.  But we cannot weigh witness credibility issues
that depend on the appearance and demeanor of the witnesses, for that is the
factfinder=s province.  Id. at 573B74.  And even when credibility issues appear in
the appellate record, we must defer to the factfinder=s
determinations as long as they are not unreasonable.  Id. at 573.

In
reviewing the evidence for factual sufficiency in parental termination cases,
we must give due deference to the factfinder=s
findings and not supplant the judgment with our own.  In re H.R.M., 209 S.W.3d 105, 108
(Tex. 2006).  We must determine whether,
on the entire record, a factfinder could reasonably form a firm conviction or
belief that the parent violated the relevant conduct provisions of section 161.001(1)
and that the termination of the parent-child relationship would be in the best
interest of the child.  In re C.H.,
89 S.W.3d at 28.  If, in light of the
entire record, the disputed evidence that a reasonable factfinder could not
have credited in favor of the finding is so significant that a factfinder could
not reasonably have formed a firm belief or conviction in the truth of its
finding, then the evidence is factually insufficient.  In re H.R.M., 209 S.W.3d at 108. 

2.
Legally and Factually Sufficient Evidence of Endangerment








In his
second issue, Appellant argues the evidence is legally and factually
insufficient to support the trial court=s
endangering-conduct and endangering-environment findings.  See Tex. Fam. Code. Ann. ' 161.001(1)(D),
(E).  Endangerment, as that term is used
in the statute, means to expose to loss or injury, to jeopardize.  Boyd, 727 S.W.2d at 533; see also
In re M.C., 917 S.W.2d 268, 269 (Tex. 1996); In re J.T.G., 121
S.W.3d 117, 125 (Tex. App.CFort
Worth 2003, no pet.).  Based on this
definition and the record before us, we conclude that the evidence is legally
and factually sufficient to support the trial court=s
endangerment findings.  See Tex.
Fam. Code. Ann. ' 161.001(1)(D), (E).  








To prove
endangerment under subsection (D), the Department had to prove that Appellant
(1) knowingly (2) placed or allowed K.W. to remain (3) in conditions or
surroundings that endangered his physical or emotional well-being.  See id. ' 161.001(1)(D).  Under section 161.001(1)(E), the relevant
inquiry is whether evidence exists that the endangerment of K.W.=s
physical or emotional well-being was the direct result of Appellant=s
conduct, including acts, omissions, or failures to act.  Id. ' 161.001(1)(E);
In re J.T.G., 121 S.W.3d at 125. 
Additionally, termination under subsection (E) must be based on more than
a single act or omission; a voluntary, deliberate, and conscious course of
conduct by the parent is required.  In
re J.T.G., 121 S.W.3d at 125; In re D.T., 34 S.W.3d 625, 634 (Tex.
App.CFort
Worth 2000, pet. denied).  However, it is
not necessary that the parent=s
conduct be directed at the child or that the child actually suffer injury.  Boyd, 727 S.W.2d at 533; In re
J.T.G., 121 S.W.3d at 125.  The
specific danger to the child=s
well-being may be inferred from parental misconduct standing alone.  Boyd, 727 S.W.2d at 533; In re R.W.,
129 S.W.3d 732, 738 (Tex. App.CFort
Worth 2004, pet. denied).  To determine
whether termination based on endangerment is necessary, courts may look to
parental conduct occurring both before and after the child=s
birth.  In re D.M., 58 S.W.3d 801,
812 (Tex. App.CFort Worth 2001, no pet.). 

A
factfinder may infer from past conduct endangering the well-being of a child
that similar conduct will recur if the child is returned to the parent.  See In re D.L.N., 958 S.W.2d 934, 941
(Tex. App.CWaco 1997, pet. denied), disapproved
on other grounds by In re J.F.C., 96 S.W.3d at 267 n.39, and In re C.H.,
89 S.W.3d at 26.  A child is endangered
when the environment creates a potential for danger that the parent is aware of
but disregards.  See In re S.M.L.,
171 S.W.3d 472, 477 (Tex. App.CHouston
[14th Dist.] 2005, no pet.).  








Drug use
and its effect on a parent=s life
and his ability to parent may establish an endangering course of conduct.  In re R.W., 129 S.W.3d at 739 (citing
Dupree v. Tex. Dep=t of Protective & Regulatory
Servs., 907 S.W.2d 81, 84 (Tex. App.CDallas
1995, no writ)); In re J.T.G., 121 S.W.3d at 125.  Evidence of criminal conduct, convictions,
and imprisonment prior to the birth of a child will support a finding that a
parent engaged in a course of conduct that endangered the child=s
well-being.  In re J.T.G., 121
S.W.3d at 133.  While imprisonment alone
does not constitute a continuing course of conduct that endangers the physical
or emotional well-being of a child, it is a fact properly considered on the
issue of endangerment.  Boyd, 727
S.W.2d at 533B34; In re R.W., 129
S.W.3d at 743B44. 

The
record contains substantial evidence of environmental endangerment and course
of conduct endangerment to K.W.=s
physical or emotional well-being. 
Because the evidence concerning these two statutory grounds for
termination is interrelated, we consolidate our examination of that evidence.  In re M.C.T., 250 S.W.3d 161, 169
(Tex. App.CFort Worth 2008, no pet.);
see In re J.T.G., 121 S.W.3d at 126.

Appellant
contends there is no evidence showing that Appellant knowingly placed or
allowed K.W. to remain in conditions or surroundings that endangered K.W.=s
physical or emotional well-being. 
However, the record demonstrates Appellant has a long history of illegal
drug useCand admitted
to using methamphetamine with Mother.  








Four of
Appellant=s eight criminal convictions
relate to possession of methamphetamine and Appellant is on deferred
adjudication through September 2018 for a fifth drug offenseCpossession
with intent to deliver methamphetamine. 
Over the last decade, Appellant served a total of thirty-six months in
the Tarrant County jail and returned to the State=s
custody on September 2, 2008, to serve a four-year term for unlawful possession
of a firearm.[12]

Appellant
testified that he and Mother were friends, they had a relationship before
Appellant=s brief incarceration in July
2007, and they used methamphetamine togetherCpossibly
while Mother was pregnant with K.W.:

Q: Have
you ever used methamphetamine with [Mother]?

A: Yes,
ma=am.

Q: When, prior to your incarceration, when had
been the last time you had used methamphetamine with [Mother]?

 

A: I can=t
recall.

Q: Would it have been during the time period
between August 2007 and when you went back into jail in November [2007]?[13]

 

A: I
guess. I can=t recall. It was a long time
ago. 








Appellant
knew two months into Mother=s
pregnancy that she was pregnant with his child.[14]  Appellant testified at trial that he was very
concerned when he learned that Mother and K.W. tested positive for
methamphetamine at K.W.=s birth.  However, the record is devoid of evidence of
Appellant=s actions to ensure K.W.=s safety
in Mother=s womb.[15]  Moreover, Appellant testified that, in his
opinion, Mother did not need drug abuse treatment. Appellant also supported
Mother=s
custody of K.W., instructing his family not to interfere with Mother=s
ability or potential to regain custody of K.W.[16]








We have
carefully reviewed the entire record. 
Looking at the evidence in the light most favorable to the finding and
judgment, and assuming the trial court resolved any disputed facts in favor of
its finding if it could have reasonably done so, we hold that the trial court
could have reasonably formed a firm belief or conviction that Appellant=s
conduct endangered K.W. and that Appellant knowingly allowed K.W. to remain in
an endangering environment by ignoring Mother=s drug
use both before and after K.W.=s birth.
 See Tex. Fam. Code Ann. ' 161.001
(D), (E); In re J.F.C., 96 S.W.3d at 265B66; In
re C.H., 89 S.W.3d at 25; In re J.T.G., 121 S.W.3d at 124; see
also In re T.J., No. 02-05-00353-CV, 2006 WL 820518 at *6 (Tex. App.CFort
Worth Mar. 30, 2006, no pet.) (mem. op.) (holding that evidence was legally and
factually sufficient to support trial court=s
findings on endangerment due to parent=s
criminal history and illegal drug use). 
Therefore, we hold the evidence is legally sufficient to support both of
the trial court=s endangerment findings.  Likewise, giving due deference to the trial
court as factfinder, we hold that the evidence is also factually sufficient to
support both of the trial court=s
endangerment findings.  We overrule
Appellant=s second issue.

Accordingly,
because the evidence at trial was legally and factually sufficient to support
the termination of Appellant=s
parental rights under family code sections 161.001(1)(D) and (E), we need not
address Appellant=s third issueCwhether
the trial court erred in finding Appellant constructively abandoned K.W.  See in re E.M.N., 221 S.W.3d at 821; see
also Tex. R. App. P. 47.1.

3.
Termination Is In K.W.=s Best
Interest








In his
fourth issue, Appellant argues that the evidence is factually insufficient to
support the trial court=s finding that termination of
his parental rights is in K.W.=s best
interest.  See Tex. Fam. Code Ann.
' 106.001(2).  While there is a strong presumption that
keeping a child with a parent is in the child=s best
interest, the record shows the evidence is factually sufficient to support the
trial court=s finding that termination of
Appellant=s parental rights is in K.W.=s best
interest.  See id.; In re R.R.,
209 S.W.3d 112, 116 (Tex. 2006).

Prompt
and permanent placement of the child in a safe environment is presumed to be in
the child=s best interest.  Tex. Fam. Code Ann. '
263.307(a) (Vernon 2006).  The following
factors, among others, should be considered in evaluating the parent=s
willingness and ability to provide the child with a safe environment: 

(1) the child=s age and physical and
mental vulnerabilities; (2) the frequency and nature of out‑of‑home
placements; (3) whether there is a history of substance abuse by the child=s family or others who
have access to the child=s home; (4) the
willingness and ability of the child=s family to seek out, accept, and complete
counseling services and to cooperate with and facilitate an appropriate agency=s close supervision; (5)
the willingness and ability of the child=s family to effect positive environmental and
personal changes within a reasonable period of time; (6) and whether the child=s family demonstrates
adequate parenting skills, including providing the child and other children
under the family=s care with minimally
adequate health and nutritional care; a safe physical home environment; and an
understanding of the child=s needs and capabilities.  

 

Id. ' 263.307(b);
In re M.R.J.M., 280 S.W.3d 494, 506 (Tex. App.CFort
Worth 2009, no pet.).








Other,
nonexclusive factors that the trier of fact in a termination case may use in
determining the best interest of the child include: (1) the desires of the
child; (2) the emotional and physical needs of the child now and in the future;
(3) the emotional and physical danger to the child now and in the future; (4)
the parental abilities of the individuals seeking custody; (5) the programs
available to assist these individuals to promote the best interest of the
child; (6) the plans for the child by these individuals or by the agency
seeking custody; (7) the stability of the home or proposed placement; (8) the
acts or omissions of the parent which may indicate that the existing parent‑child
relationship is not a proper one; and (9) any excuse for the acts or omissions
of the parent.  Holley v. Adams,
544 S.W.2d 367, 371B72 (Tex. 1976).  

These
factors are not exhaustive; some listed factors may be inapplicable to some
cases while other factors not on the list may also be considered when
appropriate.  C.H., 89 S.W.3d at
27.  Furthermore, undisputed evidence of
just one factor may be sufficient in a particular case to support a finding
that termination is in the best interest of the child.  Id. 
On the other hand, the presence of scant evidence relevant to each
factor will not support such a finding.  Id.








K.W. was
almost eleven months old at the time of the termination hearing and has never
lived with Appellant.  Appellant stated
he was not sure when he might be able to provide K.W. with a safe and stable
home, but said he believed he could do so nine months after he is released from
his four-year jail sentence.[17]  Appellant testified that he could be paroled
as early as February 2009.  Appellant
agreed that this timeframe would be contingent on him not violating the law,
the conditions of his parole, or the terms of his 10-year deferred adjudication
probation for possession with intent to distribute methamphetamine.








Regarding
Appellant=s parenting abilities and
willingness to seek out, accept, and complete counseling services to assist him
in promoting K.W.=s best interest, Appellant
admitted he did not sufficiently complete his service plan during the four
months before he returned to jail and said that he Ajust
didn=t have
time to, or transportation or finances, for any of that.@  Additionally, CPS had no address for
Appellant and none of the phone numbers provided by Mother and Appellant
worked.  Indeed, Appellant had no contact
with CPS between the May 7 status hearing and July 3, 2008, and again between
July 10, 2008, and November 2008, after Appellant=s return
to jail.  Appellant explained the lack of
contact with CPS resulted because it Aseem[ed]
like I was getting the runaround from whomever answered the phone there at the
[CPS] office when I would call . . . and then I gotCI had
stuff in storage and I was just caught up in trying to get prepared to go back
into custody for this four years.@ 

CPS set
weekly visits with K.W. for Appellant.  According
to CPS records, Appellant visited K.W. two times, on May 6 and July 3, 2008,
and did not visit at all during the month of August.  In contrast, Appellant testified he visited
K.W. Aat least
six or seven@ times, including two visits
with K.W. before meeting the CPS caseworker for the first time on May 6, but
conceded that he did not attend the Alast
couple of visits.@[18]  Appellant admitted his failure to visit K.W.
suggested he placed a higher priority on caring for his property than on seeing
his son:

Q:     Did
you believe that [not visiting weekly] was behavior that indicated or
demonstrated your commitment to putting this child as a priority in your life?

 

A:     I
knew that I was going to have to go back into custody, and I just had the few
limited things I had remaining in the world together preparing for me to come
in and do this time.

 

Q:     So it
was more important for you to get your property in order rather than your
son?  Is that what you=re saying?

 

A:     That=s not
what I am saying.  I=m saying
that I was made aware by my lawyer that time was running out, period, and it
doesn=t make
me look good, but I guess that=s true,
I guess. 








Appellant
contends that K.W.=s best interests could be met by
placing K.W. with Appellant=s
sister, and that his sister was willing and able to assume parental duties
during Appellant=s absence.[19]  Reasonable efforts should be made with
respect to a child to be placed in foster care to preserve and reunify families
and to give preference to an adult relative over a non-related caregiver in determining
the placement of a child.  In re C.C.,
No. 02-04-00206-CV, 2005 WL 1244672, at *6 (Tex. App.CFort
Worth May 26, 2005, no pet.) (mem. op.) (citing 42 U.S.C.A. ' 671(a)(15)(B),
' 671(a)(19)
(2003)).  However, Appellant provides no
authority to suggest that there is either a statutory or a common‑law
duty imposed on the Department to make such a placement or to investigate such a
placement before a party's parental rights may be terminated.  The determination of where the child will be
placed is a factor in evaluating the child=s best
interest, but it is not a bar to termination that placement will be with
non-relatives.  Id. at *7;
Rogers v. Dep=t of Family and Protective Servs, 175
S.W.3d 370, 379 (Tex. App.CHouston
[1st Dist.] 2005, pet. dism=d
w.o.j.).








In
considering the placement of K.W. as a factor to determine his best interest,
the evidence demonstrated that Appellant=s sister
wanted K.W. placed with her shortly after his birth, but knew at the time that
her live-in boyfriend=s criminal historyCa child
endangerment charge involving driving and drugsCwould
disqualify her from being a candidate for placement.  Appellant=s sister
testified that she and her boyfriend broke up in August 2008, and that she and
their two-year-old daughter temporarily moved in with her parents until one
week prior to the termination hearingCwhen she
rented her own apartment and notified CPS she would like to be reconsidered for
placement.  Appellant=s sister
testified that her former boyfriend continues to visit their daughter once or
twice a week for a couple of hours each time.[20]  Accordingly, the trial court could have
formed a firm conviction or belief that Appellant and his family were unwilling
to effect positive personal changes within a reasonable period of time, were
unable to demonstrate adequate parenting abilities, and were unable to provide
K.W. with a stable home environment.  See
Tex. Fam. Code Ann. ' 263.307(a); Holley, 544
S.W.2d at 371B72; In re M.R.J.M., 280
S.W.3d at 506; Rogers, 175 S.W.3d at 379, In re C.C., 2005 WL
1244672 at *6.








The
record also reveals that from October 2008 through the January 26, 2009
hearing, Appellant=s sister and Appellant=s mother
regularly visited K.W.Capproximately three or four
times per month.  Appellant=s sister
testified she believes K.W. has bonded with her during the weekly visits over
the last four months.  However, a CPS
caseworker testified that while K.W. Aappears
to enjoy the visits@ she did not Aknow
that he=s
necessarily bonded to the relatives.@  K.W=s foster
mother testified that she believed K.W. is bonded with his foster family, that
his foster family wishes to adopt him, and that, A[K.W.]
is awesome . . . . we love [K.W.] more than anything in this world, and there
is nothing that we wouldn=t do for [K.W.].@  Thus, in giving due deference to the trial
court as factfinder, the trial court could have found that termination of
Appellant=s parental rights was in K.W.=s best
interest based in part on the stability and strength of the relationship
between K.W. and his foster family.








Regarding
K.W.=s
physical needs, he was recently diagnosed with asthma, must be given breathing
treatments twice a day, and is Avery
susceptible to smoke.@ 
No one in K.W.=s foster home smokes.[21]  Appellant=s sister
testified that when she goes to work, her two-year-old daughter is watched by
her mother, who lives less than a mile away. 
Appellant=s sister testified that her
mother smokes half a pack of cigarettes per day, but steps outside to smoke
when she is watching the child.  If K.W.
were placed with Appellant=s
sister, her mother would watch K.W. and her daughter at Appellant=s sister=s
apartment.  If granted custody of K.W.,
Appellant=s sister testified that she
would want Appellant involved in K.W.=s life
as long as Appellant was drug-free. 
Based on this record evidence, the trial court could have formed a firm
conviction or belief that terminating Appellant=s
parental rights was in K.W.=s best
interest due to K.W.=s physical needs and the
inability of Appellant=s family to effect positive
environmental changes.  See Tex.
Fam. Code Ann. ' 263.307(a); Holley, 544
S.W.2d at 371B72; In re M.R.J.M., 280
S.W.3d at 506. 








Giving
due consideration to evidence that the factfinder could have reasonably found
to be clear and convincing, and based on our review of the entire record, we
hold the trial court could have reasonably formed a firm belief or conviction
that termination of Appellant=s
parental rights would be in K.W.=s best
interest.  See In re C.H., 89
S.W.3d at 28; see also In re K.W., No. 02-07-00458-CV, 2008 WL 2639037,
at *4 (Tex. App.CFort Worth July 3, 2008, no pet.)
(mem. op.) (holding that clear and convincing evidence existed that termination
of father=s parental rights was in child=s best
interest where, among other factors, father had a pattern of criminal conduct
and drug abuse).  Accordingly, we hold
that the evidence to support the trial court=s best
interest finding was factually sufficient, and we overrule Appellant=s fourth
issue.

IV. Conclusion

Having
overruled Appellant=s dispositive issues,[22]
we affirm the trial court=s judgment terminating his
parental rights to K.W.

 

ANNE GARDNER

JUSTICE

 

PANEL:  LIVINGSTON, GARDNER and
MCCOY, JJ.

 

DELIVERED:  January 14, 2010











[1]See Tex. R. App. P. 47.4.





[2]The Department
interviewed Mother on Friday, March 7, 2008, and filed the petition the
following Monday.





[3]Mother did not attend the
final hearing.  Her counsel announced Anot ready@ to proceed and requested
a continuance because she claimed she did not receive proper notice of the
January 26, 2009 hearing.  The trial
court denied Mother=s request.





[4]Appellant testified his
daughter was born prior to the assault in 2001. 
But at the January 2009 parental termination hearing, Appellant was
unable to recall his daughter=s birthday, believed she was eight years of age,
and stated he had not seen her in several years.





[5]Appellant served this
180-day sentence from July 23, 2007, through August 2, 2007, and from November
7, 2007, through April 25, 2008.  Thus,
Appellant was incarcerated at the time of K.W.=s birth.





[6]Appellant began serving a
four-year sentence for the offense of unlawful possession of a firearm on
September 2, 2008.





[7]Mother gave birth to a
child who tested positive for drugs in October 2005, resulting in the removal
of Mother=s two children and
voluntary placement of the children with Mother=s mother.





[8]Appellant placed this
request on May 6, 2008, the first time he met K.W. and Lagadinos.





[9]Mother tested positive
for methamphetamine in December 2008 and broke off contact with CPS at that
time.





[10]At the hearing, Appellant=s sister testified that
after breaking up with her boyfriend in August 2008, she temporarily moved in
with her parents.  She also testified
that the former boyfriend continues to visit their daughter once or twice a
week for a couple of hours each time.





[11]In its brief, the
Department acknowledges, AThe trial court=s paternity finding
cannot be defended under controlling precedent.@





[12]Appellant testified that
he received a one-year credit toward his four-year sentence and could be
released on parole to begin a rehabilitation program as early as February 2009.





[13] Mother was two months= pregnant with K.W. in
August 2007 and five months= pregnant in November 2007.





[14]Mother told Appellant
about her pregnancy during his incarceration from July 23 through August 2,
2007.





[15]See In re M.J.M.L.,
31 S.W.3d 347, 351B52 (Tex. App.CSan Antonio 2000, pet.
denied) (finding sufficient evidence of endangerment where the father knew the
pregnant mother was a drug abuser but failed to make arrangements for the care
of his soon-to-be-born child, choosing instead to leave the child in the care
of a drug-addicted mother).





[16]The record does not
indicate whether Appellant knew that CPS removed two children from Mother in
October 2005 because of Mother=s drug abuse, or that those children were placed
with their maternal grandmother.





[17]Upon release from jail,
Appellant must enroll in a rehabilitation center for six months and then transition
to an outpatient program for another three months.





[18]Appellant also testified
he attended Abetween seven and ten@ visits with K.W.





[19]During the hearing, a
Department caseworker testified that, upon termination of Appellant=s parental rights, CPS
planned to consider Appellant=s sister as a placement for K.W. or,
alternatively, for K.W. to be adopted by the current foster parents.





[20]Appellant=s sister testified that,
if awarded custody of K.W., she would follow a court order prohibiting any
contact between K.W. and her former boyfriend. 





[21]To help K.W.=s breathing, the foster
family found other homes for their three dogs, replaced the carpet in their
home, purchased humidifiers, moved K.W. to a private daycare with fewer
children, and required the lone family member who smokes to Aput something on over her
clothes and [told] her not to smoke prior to coming over to visit.@





[22]See Tex. R. App. P. 47.1.